UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| JASON RICHEY d/b/a <br> ON TIME SERVICES, <br><br> Plaintiff, <br><br> v. <br><br> MOTION INDUSTRIES, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) No.: 3:07-CV-466 <br> ) (VARLAN/SHIRLEY) <br> ) <br> ) <br> ) |

**MEMORANDUM AND ORDER**

This civil action is before the Court on Plaintiff Jason Richey d/b/a On Time Services' ("Plaintiff") Motion for Summary Judgment. [Doc. 14.] Defendant Motion Industries, Inc. filed a brief in opposition to Plaintiff's summary judgment motion [Doc. 24], to which Plaintiff filed a reply. [Doc. 24.] The motion is now ripe for the Court's consideration. The Court has carefully considered the pending motion, along with the parties' supporting materials. [*See* Docs.14, 15, 23, 24] For the reasons set forth herein, Plaintiff's Motion for Summary Judgment [Doc. 14] will be denied.

**I. BACKGROUND**

Plaintiff is self-employed and operates a delivery business known as On Time Services. [Doc. 14-2 at 5.] One of Plaintiff's delivery service clients was the Knoxville, Tennessee, branch of Defendant Motion Industries, Inc. ("Defendant"). Plaintiff began

providing his services to Defendant in the 1990s and continued to do so until 2007. [*See* Doc. 24-1 at 38.]

In 1998, Plaintiff allegedly executed a written agreement for delivery services with Defendant's operations manager at the time, Jess Terry ("Mr. Terry"). [Doc. 14-2 at 9.] According to Plaintiff, Mr. Terry has possession of the written agreement, but the parties have been unable to locate this alleged document. [Doc. 14-2 at 9; 23-2 at 9.] Mr. Terry does not recall whether there was a written agreement with Plaintiff for delivery services and testified that there was a verbal agreement for Plaintiff to do "x number of stops x number of times and for x number of dollars . . . [a]nd we just kind of made a gentlemen's agreement, you know, that that's the way it would be." [Doc. 23-2 at 38, 42.] This purported written agreement was allegedly nearing expiration in 2004. [Doc. 23-2 at 62-63.]

At that time, Tony Widner ("Mr. Widner") was branch manager of Defendant's Knoxville branch as well as the branch manager of Defendant's Morristown, Tennessee, branch. [Doc. 14-3 at 5.] Under Defendant's supervisory hierarchy, the branch manager is the highest ranking employee at the Knoxville location and oversees other employees, including the operations manager. [Docs. 14-3 at 20; 14-4 at 6.] While the branch manager has overall responsibility for the branch, the operations manager is over the branch personnel, including warehouse and office employees. [Docs. 14-3 at 20; 14-4 at 6.] Above the branch manager, Defendant's supervisory chain includes the division or regional manager and then the group vice president. [Doc. 14-4 at 9.]

2

Central to the present litigation, Plaintiff and Mr. Widner allegedly signed a "Contractor Agreement" dated August 10, 2004. [Docs. 14-1 at 1.] It is a form document that Plaintiff purchased at an office supply store with pre-printed language and blank spaces that Plaintiff filled out in his own handwriting. [*See* Docs. 14-1; 23-2 at 14.] In Article 3 entitled "Contract Price," Plaintiff wrote that Defendant would pay him $3800 on a monthly basis for delivery services. [Doc. 14-1 at 1.] In Article 8 entitled "Additional Terms," Plaintiff included the following handwritten provision:

> Motion Industries or its Agent can Terminate This Contract without cause At Anytime provided they issue A notice of No Less than Sixty (60) days and provide Compensation totalling [sic] ($150,000) one hundred and fifty thousand Dollars Payment must be made within the 60 day Notice period or The Buyout payment shall Double! This contract Renews Automatically in Aug. 09 For 60 months Ending Aug 2014 Any Legal Fees will Be incurred By Motion Industries.

[Doc. 14-1 at 3.] Plaintiff and Mr. Widner initialed next to these handwritten provisions in the "Contractor Agreement." [*See* Doc. 14-1.] According to Charles Meurisse ("Mr. Meurisse), Defendant's Atlanta-based vice president/general manager, Mr. Widner did not consult with him about the "Contractor Agreement." [Doc. 23-2 at 99.]

In 2007, Creed Headrick ("Mr. Headrick") replaced Mr. Widner as the branch manager of Defendant's Knoxville location. [Doc. 14-4 at 5.] According to Mr. Headrick, he sought to terminate Plaintiff's service to the Knoxville branch. [Doc. 14-4 at 9.] Mr. Headrick typed a letter, which was approved by the group vice president, David James ("Mr. James"). [Doc. 14-4 at 10.] The May 15, 2007, letter provided Plaintiff with "notice that we are executing a withdrawal from our agreement effective June 30, 2007." [Doc. 24-1 at 38.]

3

The alleged reasons for terminating Plaintiff's services included a desire to create an entry-level position "to learn our business" and issues with Plaintiff's performance, namely deliveries not being consistently made in the afternoon. [Docs. 14-4 at 9; 23-2 at 24.] In addition to the letter, Mr. Headrick also met with Plaintiff to inform him of the decision to terminate delivery services with Defendant. [Doc. 23-2 at 28.] Prior to the meeting, Plaintiff allegedly had an awareness that Mr. Headrick wanted to terminate his delivery services and informed the operations manager, Steve Dutt ("Mr. Dutt"), of a written agreement regarding Plaintiff's delivery services. [Doc. 23-2 at 30.] According to Mr. Headrick, he was previously unaware of the "Contractor Agreement" signed by Mr. Widner. [Doc. 23-2 at 33.] Plaintiff subsequently filed a breach of contract action in state court, which was then removed to the Court on the basis of diversity jurisdiction. [*See* Doc. 1; 1-1 at 5-8.]

## II. ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To

4

establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the fact finder. *Id.* at 249. The judge does not weigh the evidence, judge the credibility of witnesses, nor determine the truth of the matter. *Id.* Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

### B. Breach of Contract Claim

In Tennessee, the essential elements of a breach of contract claim "include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *C & W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676-77 (Tenn. Ct. App. 2007) (quoting *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). In support of the motion for summary judgment, Plaintiff contends that he has established the elements for his breach of contract claim, namely, that the Contractor Agreement was a validly executed contract and that Defendant breached this contract by refusing to give mutually agreed upon notice of

termination and by refusing to pay contractually agreed upon monies upon termination. Defendant counters that summary judgment is inappropriate because genuine issues of material fact remain with respect to the following issues: (1) whether there was a meeting of the minds in mutual assent to the terms of the Contractor Agreement; (2) whether Mr. Widner had the authority to sign the Contractor Agreement and bind Defendant; (3) whether it was reasonable for Plaintiff to assume Mr. Widner had the authority to sign the Contractor Agreement; and (4) whether the Contractor Agreement was terminated for cause. Plaintiff replies that there are no genuine issues of material fact that would preclude summary judgment in this matter.

### 1. Scope of Agency

Even assuming for the sake of argument that there was mutual assent between Plaintiff and Mr. Widner in this case, the remaining issues regarding the agency relationship between Mr. Widner and Defendant preclude summary judgment in this matter. The concept of agency "includes every relation in which one person acts for or represents another." *White v. Revco Disc. Drug Ctrs., Inc.*, 33 S.W.3d 713, 723 (Tenn. 2000). Under Tennessee law, "[w]hen an agency relationship exists, the principal may be bound by the acts of the agent performed on the principal's behalf and within the actual or apparent scope of the agency." *Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 432 (Tenn. 2008). The focus of this inquiry is "placed upon the actions and consent of the principal, rather than upon the agent's actions or the willingness of the agent to perform those actions." *White*, 33 S.W.3d at 723. In the present case, it is undisputed that Mr. Widner was an agent of Defendant due to his

6

employment as a branch manager of the Knoxville location. However, Defendant disputes whether Mr. Widner's acts regarding the Contractor Agreement were within the actual or apparent scope of his agency.

An agent's actual authority "consists of the powers which a principal directly confers upon an agent or causes him to believe himself to possess." *Milliken Group, Inc. v. Hays Nissan, Inc.*, 86 S.W.3d 564, 567 (Tenn. Ct. App. 2001) (citation omitted). Tennessee courts have recognized that "[a]ctual authority flows from the manifestations of the principal to the agent." *Id.* In the present case, Plaintiff contends that Mr. Widner had actual authority to enter into the Contractor Agreement due to his status as the highest ranking employee at the Knoxville location. [Docs. 14-3 at 20; 14-4 at 6.] Plaintiff points to evidence that branch managers at other locations made decisions about outsourcing delivery services. [Doc. 24-1 at 3, 5, 7.] While such evidence arguably supports Plaintiff's position on the issue of Mr. Widner's actual authority to enter into outsourcing agreements, Defendant has presented deposition testimony that upper management approval was needed when such agreements involved long-term commitments embodied in the automatic renewal and buy-out provisions and that other branch managers had an awareness of this requirement. [Doc. 23-2 at 49, 84-85, 100.] For instance, there is deposition testimony that a branch manager would not be able to execute a lease on behalf of Defendant. [Doc. 23-2 at 52, 106.] One of Defendant's prior branch managers, Melvin Clements ("Mr. Clements"), testified that he would have asked a regional manager to approve a long-term written contract for outside courier services. [Doc. 23-2 at 50.] Such evidence could indicate that the scope of a branch manager's authority to

7

enter into agreements such as the one at issue was limited by Defendant. Because Defendant benefits from a standard that views the facts and all inferences in the light most favorable to it as the non-moving party, the Court finds that Defendant has presented sufficient evidence to raise a genuine issue of material fact as to whether Mr. Widner had actual authority to enter into the Contractor Agreement. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

In addition to actual authority, a principal may be bound by acts that are within an agent's apparent scope of authority. *Boren ex rel. Boren*, 251 S.W.3d at 432. The elements of apparent agency are: (1) the principal actually or negligently acquiesced in another party's exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the apparent agent possessed such authority; and (3) the third person relied on this apparent authority to his or her detriment. *Id.* at 432-33. The Tennessee Supreme Court has recognized:

> The apparent power of an agent is to be determined by the acts of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority. The liability of the principal is determined in any particular case, however, not merely by what was the apparent authority of the agent, but by what authority the third person, exercising reasonable care and prudence, was justified in believing that the principal had by his acts under the circumstances conferred upon his agent.

*Id.* at 433 (quoting *Southern Ry. Co. v. Pickle*, 197 S.W. 675, 677 (Tenn. 1917)).

The Court finds that Defendant has presented sufficient evidence to raise a genuine issue of material fact regarding whether Defendant clothed Mr. Widner with apparent authority to bind Defendant to the automatic renewal and buyout provisions. Evidence such

8

as Mr. Widner's position as a branch manager and Defendant's payment of his submitted invoices support Plaintiff's argument regarding Mr. Widner's apparent authority. However, there is other evidence that raises the issue of whether Plaintiff had "knowledge of the facts and a good faith belief that the apparent agent possessed such authority." *Boren ex rel. Boren*, 251 S.W.3d at 433. Though Plaintiff contends that there was a prior written agreement with Mr. Terry which contributed to his good faith belief in Mr. Widner's authority, Mr. Terry testified that their agreement was merely a verbal or gentlemen's agreement. [Doc. 14-2 at 9; 23-2 at 9, 38, 42.] There is also deposition testimony about an unsigned proposed contract from 1998 that was purportedly considered by Mr. Terry. [Doc. 14-2 at 6.] Mr. Terry further testified that he would not have signed a written contract without his branch manager's approval, and there is testimony by other branch managers that higher management approval was needed for the sort of terms included in the Contractor Agreement. [Doc. 23-2 at 39, 50.] When this evidence is construed in a light most favorable to Defendant, there arise questions about Plaintiff's good faith as to Mr. Widner's apparent authority in light of Plaintiff's alleged previous unsuccessful attempt to bind Defendant with a written agreement through Mr. Terry. Such evidence could demonstrate a lack of good faith by Plaintiff based on his previous dealings with Mr. Terry whose testimony along with that of the other branch managers evidence an understood need for higher management approval for agreements such as the one sought by Plaintiff. In light of such evidence, reasonable minds could differ as to whether Plaintiff had good faith as to Mr. Widner's authority to agree to the automatic renewal and buyout terms. While the Court makes no

determination as to whether Defendant will ultimately prevail at trial on the issue of Plaintiff's good faith and whether there was a written agreement with Mr. Terry, such issues remain for resolution by the finder of fact.

### 2. Termination for Cause

In addition to the issue of agency, the Defendant also argues that the issue of whether it terminated the contract for cause remains for the finder of fact at trial. In his deposition, Plaintiff testified that a majority of the handwritten portions of the Contractor Agreement were filled in by him prior to meeting with Mr. Widner. [Doc. 23-2 at 16.] While Plaintiff handwrote into the Contractor Agreement a provision addressing the situation where the contract is terminated "without cause," the Contractor Agreement is otherwise silent on the issue of terminating the contract under other circumstances. [Doc. 23-1 at 3.] In cases involving questions of contract interpretation, Tennessee law recognizes that "the wording of the contract is to be construed against the drafter." *Towe Iron Works, Inc. v. Towe*, 243 S.W.3d 562, 569 n.3 (Tenn. Ct. App. 2007). Thus, because the Contractor Agreement only expressly applies the buyout provision to cases of termination "without cause," the buyout provision is inapplicable to terminations that fall outside of the scope of "without cause" as the term applies to the buyout provision.

In light of this interpretation of the Contractor Agreement, the Court agrees with Defendant that there is a genuine issue of material fact as to whether termination was "without cause" in this case. Mr. Headrick testified that the decision to terminate Plaintiff's services was made, in part, "because we had the issue with afternoon deliveries." [Doc. 23-2

10

at 23.] More specifically, Plaintiff allegedly failed to consistently return after lunch to make afternoon deliveries thereby resulting in Defendant needing the services of other courier services to make the afternoon deliveries. [Doc. 23-2 at 24.] When construed in a light most favorable to Defendant, such evidence suggests that the decision to terminate Plaintiff's services was due, at least in part, to his performance issues and was therefore not "without cause."

While Mr. Headrick also testified that there were also non-performance-related reasons for terminating Plaintiff's services, the Court notes that the Contractor Agreement does not define the term "without cause." It is silent on whether a decision to terminate the Contractor Agreement when motivated by more than one reason, including alleged non-performance of services by Plaintiff, would fall within the scope of a termination "without cause." As discussed above, Tennessee law recognizes that "the wording of the contract is to be construed against the drafter," which is Plaintiff in this case. *Towe Iron Works, Inc.*, 243 S.W.3d at 569 n.3. Therefore, it follows that Defendant's decision to terminate the agreement based, even partly, on Plaintiff's failure to perform his services would fall outside the scope of a "without cause" termination. As a result, the Contractor Agreement's buyout provision and automatic renewal provision would not apply. While the trier of fact may ultimately find that this purported reason did not motivate the termination decision, Defendant has sufficiently overcome summary judgment at this time.

## III. CONCLUSION

For the reasons set forth herein, Plaintiff Jason Richey d/b/a On Time Services' Motion for Summary Judgment [Doc. 14] is hereby **DENIED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE
